# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DARRON EASTERLING,                )
                                  )
              Plaintiff,          )
                                  )       CIVIL ACTION FILE
v.                                )
                                  )       NO. 1:00-CV-1715-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER    )
BROADCASTING SYSTEM, INC.,        )
                                  )
              Defendants.         )

## DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiff Darron Easterling's Response to Defendants' Motion

for Summary Judgment fails to raise any specific, material,

disputed issues of fact that would require denial of Defendants'

Motion.  Rather, Easterling attempts to avoid his burden of

producing evidence to establish the material elements of his own

claims by raising irrelevant issues, relying on surmise and

conjecture, and citing to documents and alleged statements that

**have absolutely nothing to do with Easterling or his claims**.

Easterling's attempts to distract the Court from the material

factual issues in his own case and enshroud his claims in a fog of

meaningless testimony and irrelevant issues are unavailing, and

cannot create a jury question where none exists.  Stripped of the

surplusage, Easterling's arguments are baseless -- each of his

claims fails as a matter of law.

114

Easterling's race discrimination claims fail because:   (1)
Easterling was not qualified for the wrestling opportunities that
he claims he was denied; (2) Easterling cannot establish that
similarly-situated white wrestlers and/or trainees were given the
wrestling opportunities about which he complains; and (3)
Easterling cannot establish that he was subjected to a racially
hostile environment at WCW.   Easterling's mischaracterization of
facts, misstatements of controlling law, unsupported self-serving
assertions, and misleading attempts to unfairly portray WCW as an
evil entity are unavailing and do not salvage his discrimination
claims.

Easterling's FLSA claim fails because, despite his after the
fact attempts to recast himself as an employee, the record is clear
that he was an independent contractor, and not an employee of WCW,
and is therefore not covered under the FLSA.

Easterling's state law claim for intentional infliction of
emotional distress fails because, by Easterling's own admission, he
bases this claim entirely on the same facts as his discrimination
claim, which is insufficient to support an intentional infliction
claim under Georgia law.

Because the undisputed evidence of record demonstrates that
Easterling cannot establish all essential elements of his claims,

Defendants' Motion for Summary Judgment should be granted as to all of Easterling's claims.

**ARGUMENT AND CITATION OF AUTHORITY**

**I.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO EASTERLING'S SECTION 1981 CLAIMS.**

Easterling, unable to articulate a comprehensible analysis of his claims under **any** legal theory, makes much of the fact that race discrimination may be established by using one of a number of methods:  the direct evidence method, the McDonnell Douglas proof scheme, or by showing a pattern and practice of discrimination through the use of statistics and anecdotal evidence.  Easterling has failed, however, to establish race discrimination under *any* of these theories.

**A.   Easterling Has Failed To Present Direct Evidence Of Discrimination.**

Easterling contends that he has established direct evidence of discrimination because there is "abundant evidence of the pervasive use of racial slurs and offensive racial animus at the WCW." (Easterling Br. at 24).  Despite Easterling's conclusory allegation, this is not, even if true, direct evidence of any purported discrimination against him.

For instance, Easterling points to testimony by former WCW employees and wrestlers commenting on statements that they contend they heard Hamilton and Orndorff make as alleged direct evidence of

discrimination. (Id. at 10~11). Such hearsay testimony is insufficient to defeat summary judgment. See Zaben v. Air Prods. & Chems., Inc., 285 F.3d 1339, 1343 (11th Cir. 1997) (comments by non-supervisors repeating management's discriminatory comments are inadmissible hearsay); see also Evans v. McClain of Georgia, Inc., 131 F.3d 957, 962 (11th Cir. 1997) (district court correctly dismissed hearsay evidence because it was "not significantly probative" and was based on "gossip, common knowledge and hearsay statement of an unidentified representative").

Moreover, the alleged statements cited by Easterling do not relate to Easterling or to any decisions by WCW with respect to Easterling. Remarks "unrelated to the decisionmaking process itself are not direct evidence of discrimination." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Direct evidence "must speak directly to the discriminatory intent as well as relate to the specific action in question." Hodges v. Stone Savannah River Pulp and Paper Corp., 892 F. Supp. 1571, 1577 (S.D. Ga. 1995).

Easterling claims to possess direct evidence that decision-makers at WCW made comments indicating a general belief that African-Americans are not competent to be professional wrestlers. (Easterling Br. at 22~23). However, none of the random testimony cited by Easterling meets this standard, and there is no evidence

in the record that any decision-makers at WCW ever made such comments.  In fact, the actions of WCW decision-makers, including Joseph Hamilton, the person in charge of the Power Plaint while Easterling trained there, prove that WCW believed the exact opposite.  The evidence is abundant and shows that WCW offered African-Americans contracts and significant opportunities to train, wrestle and perform in its most popular and prominent events. (Bischoff Dep. at 144-152; Easterling Appendix at Tab R).

Because Easterling has presented no evidence that any alleged statements by WCW employees had anything to do with Easterling or any decisions regarding Easterling, he cannot establish "the requisite nexus between the alleged [statement] and the defendant[s'] decision to not offer him a trainee contract or any additional wrestling opportunities he contends he was owed. Williams v. Mead Coated Bd., Inc., 836 F. Supp. 1552, 1571 (M.D.Ala. 1993), aff'd 41 F.3d 668 (11th Cir. 1994).  Accordingly, Easterling has failed to offer direct evidence of discrimination.

**B.  Easterling Cannot Establish Race Discrimination Under The _McDonnell Douglas_ Framework.**

**1.  Easterling Cannot Establish A Prima Facie Case Of Failure To Promote.**

Easterling cannot prove race discrimination under the McDonnell Douglas framework because the record is devoid of any evidence that Easterling was otherwise qualified for the wrestling

opportunities he sought, which is an essential element of his prima facie case of discrimination in his failure to promote-type claims.[1]

Easterling does not dispute that wrestling matches are a form of scripted entertainment, and that charisma, crowd appeal, uniqueness, wrestling skill, physical capabilities, persona and acting ability were all prerequisites for a trainee to receive a trainee contract or other opportunities at WCW. Easterling presents no evidence to dispute the proof that he was not qualified to receive a trainee contract or additional wrestling opportunities at WCW because he lacked the requisite experience, was clumsy in the ring, could not execute basic wrestling moves and had problems even staying on his feet in the ring. (Hamilton at ¶ 8, Hamilton Dep. at 66). Further, Easterling presents no evidence that he possessed any acting or speaking skills or charisma, all attributes that Easterling concedes are necessary for a trainee to receive a contract. (Easterling Dep. at 92-93). Because Easterling cannot

---

[1] In Easterling's response, he apparently seeks to broaden his allegations against WCW and now contends, for the first time, that WCW discriminated against him in unspecified ways in "administering terms and conditions of employment." (Easterling Br. at 20). Easterling's attempts to present a moving target by belatedly adding vague and unsupported allegations against WCW are unavailing, and do not save his claims from summary judgment. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

establish that he was qualified for the opportunities that he
claims he was denied, his failure to promote claim fails.

Easterling also has failed to make out a prima facie case of
failure to promote because he cannot establish that "similarly
situated or less qualified [individuals] were promoted or
transferred" to the positions about which he complains. See
Pashoian v. GTE Directories, 208 F. Supp. 2d 1293, 1308 (M.D. Fla.
2002). Rather than attempt to satisfy his burden, Easterling tries
to avoid it entirely by arguing, without any legal or factual
support, that the Court should not require him to provide such
evidence, because he believes that he would have been similarly
situated to WCW's more popular wrestlers had he received more
training and exposure. (Easterling Br. at 20-21). This
subjective, speculative assertion has no basis in fact or law, and
Easterling has offered no legal basis for the Court to ignore well-
established precedent requiring proof that similarly situated or
less qualified individuals were promoted or transferred to the
positions about which Easterling complains.[2] See Holifield v.
Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) (to satisfy the

---

[2] Easterling summarily asserts, without factual support, that WCW
wrestlers Brett Yokely, Chuck Polumbo and Alan Funk are similarly
situated. (Easterling Br. at 8). This assertion is baseless.
Easterling knows nothing and has not offered any evidence about the
background, training and/or experience of these individuals before
they began to wrestle for WCW, and, therefore, he cannot establish
that these wrestlers were similarly situated to him. See
Holifield, 115 F.3d at 1565.

requirements of a disparate treatment claim, Plaintiff must show

that he and the alleged protected persons "are similarly situated

in all relevant respects."). Because Easterling has not provided

and cannot provide any such proof, his failure to promote claim

fails.

> **2.    Easterling Cannot Establish That WCW's Proffered Legitimate Nondiscriminatory Reasons For Its Actions Were Pretextual.**

Defendants are also entitled to summary judgment because they

have articulated legitimate, nondiscriminatory reasons for WCW's

actions concerning Easterling.

In an apparent acknowledgement that he cannot offer any

competent evidence to demonstrate pretext, Easterling first

attempts to avoid his burden by alleging that the reasons proffered

by WCW are pretextual because they are not "objective factors that

can be tested against other testimony and evidence." (Easterling

Br. at 33). Easterling grossly misstates controlling law. It is

well-settled that an employer may rely upon subjective criteria in

making employment decisions. Chapman v. AI Transport, 229 F.3d

1012 (11th Cir. 2000). In Chapman, the Eleventh Circuit instructed

that

> It would be a most radical interpretation of Title VII [or
> Section 1981] for a court to enjoin use of a historically
> settled process and plainly relevant criteria largely because
> they lead to decisions which are difficult for a court to
> review… It is inconceivable that Congress intended anti-
> discrimination statutes to deprive an employer of the ability

> to rely on important criteria in its employment decisions
> merely because those criteria are only capable of subjective
> evaluation.

Id. at 1034 (emphasis added) (internal citations and quotes

omitted).  Thus, Easterling's assertion that WCW was required to

use objective factors in making its decisions on wrestlers is

simply wrong.  See Murphy v. Yellow Freight System, Inc., 832 F.

Supp. 1543, 1548 (N.D. Ga. 1993) (explaining that "[t]he use of

subjective factors in making employment decisions cannot be

sufficient to support a finding of discrimination"); Denney, 247

F.3d at 1185.

Continuing his efforts to avoid his burden to produce evidence

to establish pretext, Easterling erroneously asserts that pretext

exists because WCW purportedly failed to offer a "clear and

reasonably specific" reason for its actions.  (Easterling Br. at

33).  This assertion simply ignores the evidence of record.  WCW

explained that Easterling was not given a trainee contract or

additional wrestling opportunities beyond those he received because

he lacked experience, appeared clumsy in the ring, could not

execute basic wrestling moves, had a difficult time staying on his

feet, and did not possess the necessary charisma or acting and

speaking skills.  (Defendants' Initial Br. at 7, 12-13, 16).

Courts have found that reasons similar to those offered by WCW in

this case were sufficiently specific for adverse employment actions

and similar decision-making.  See Watson v. Fort Worth, 487 U.S.
977, 991, 108 S. Ct. 2777, 2787 (1988) (explaining that factors
such as "common sense, good judgment, originality, ambition,
loyalty, and tact" often must be assessed in subjective fashion and
may be relied upon for purposes of making employment decisions).
Chapman, 229 F.3d at 1034; Murphy, 832 F. Supp. at 1543.  The fact
that Easterling cannot offer any evidence to demonstrate pretext
does not render WCW's asserted reasons any less clear or specific.

Faced with a complete absence of evidence to demonstrate
pretext, Easterling proceeds to mischaracterize WCW's proffered
legitimate, nondiscriminatory reasons in an attempt to set up a
"straw man" pretext argument.  For example, Easterling claims that
WCW cited a need to "cut its payroll" as a reason for denying
Easterling a trainee contact, and that because WCW increased the
salary of some of its wrestlers and hired new talent around the
time that it decided not to offer Easterling a trainee contract,
WCW's reasons are pretextual.  (Easterling Br. at 35).  Contrary to
Easterling's assertion, WCW never cited a need to "cut costs" as a
reason why WCW chose not to offer Easterling a trainee contract.
As explained in Defendants' Initial Brief, in late 1998 and into
1999, WCW was **restructuring its entire business operations**, which
included restructuring its training program at the Power Plant and
significantly reducing the number of trainees.  (Myers Aff. at ¶¶

6-7; Hamilton Aff. at ¶ 6).  To effectively reduce the number of

trainees, WCW evaluated the trainees at the Power Plant and held

tryouts to determine which trainees would remain and receive

trainee contracts.  (Hamilton Aff. at ¶ 7).  WCW sought to reduce

unnecessary costs by releasing less talented and less charismatic

wrestlers from their contracts.  (Myers Aff. at ¶ 7).  These

measures enabled WCW to refocus its spending to better and more

productive uses.  WCW contracted with new wrestlers, and offered

new contracts or salary increases to existing WCW wrestlers who WCW

believed were likely to draw fan interest, increase ratings, and

ultimately generate additional revenue for WCW.  (Myers Aff. at

¶ 6; Myers Dep. at 132, 141, 144-145).  WCW's actions with respect

to Easterling and other trainees and wrestlers were entirely

consistent with its goals and statements regarding its business

downturn, in no way establish pretext, and Easterling has offered

no evidence to suggest otherwise.[3]

Easterling also attempts to demonstrate pretext by asserting

that there is contrary evidence to Defendants' position that

Easterling lacked the requisite skills to succeed.  (Easterling Br.

---

[3] Easterling selectively fails to acknowledge that WCW retained
additional African-American wrestlers during its restructuring
efforts.  (See Easterling Appendix at Tab R, noting new hires
Marcial Davis, Harrison Norris, Elix Skipper, and professional
athlete Dennis Rodman).  The fact that WCW hired other African-
American wrestlers and trainees during this time period rebuts any
inference of discrimination against African-American wrestlers.

at 37-41).   In support of this assertion, Easterling points to

Hamilton's evaluation of Easterling that states "[Easterling's]

work is starting to come around" and he "looks great with huge arms

and chest, 6 ft. 4 in. 280 lbs., big bald head, natural just big

nasty SOB." (Easterling Br. at 38-39).   Hamilton's belief that

Easterling had made some progress in his training and that he was

large does not demonstrate in any way that WCW's reasons for not

offering Easterling a trainee contract were false, or that race was

the true reason.   Easterling also ignores numerous other statements

in the record, including those by Hamilton, that establish that

Easterling's wrestling skills were not deserving of a trainee

contract or other additional opportunities, despite his size.

(Hamilton Aff. ¶¶ 8-9; Hamilton Dep. at 66 ("Darron was--was--I

thought was clumsy at times, and he just fell over his own feet

sometimes"); Bruce Dep. at 57 ("He was okay")).

The only other "evidence" Easterling offers in support of his

contention that WCW's justification regarding Easterling's

qualifications is pretext is Easterling's own subjective opinion

and the opinion of Marcial Davis, a former WCW trainee and a

Plaintiff in a related lawsuit against Defendants.[4]   Easterling and

his fellow trainee's opinion and their apparent disagreement with

---

[4] Easterling's description of Davis as "[o]ne of the unpaid
trainers at the Power Plant" is blatantly false.   (Easterling Br.
at 39)   In fact, Davis was a Power Plant trainee, and Davis never
worked as a trainer for WCW.   (Davis Dep. at 70, Exh. 7).

WCW's evaluation of Easterling's qualifications are irrelevant.
"The Eleventh Circuit has made clear, an 'employer may fire an
employee for a good reason, a bad reason, a reason based on
erroneous facts, or for no reason at all, as long as its action is
not for a discriminatory reason.'" Fletcher v. ADT Security
Services, Inc., 2000 WL 33231616 (N.D. Ga. 2000) (quoting Nix v.
WLCY Radio/Rahall Comm., 738 F.2d 1181, 1187 (11th Cir. 1987).
"Federal courts do not sit as a super-personnel department that
reexamines an entity's business decisions." Fletcher, 2000 WL
33231616 at *8 (quoting Elrod v. Sears, Roebuck & Co., 939 F.3d
1359, 1365 (11th Cir. 1991)). Regardless of Easterling or Davis's
opinion as to Easterling's qualifications, because Easterling
cannot demonstrate that WCW's reasons for not offering Easterling a
trainee contract or any other opportunities he contends he was
denied are pretext, his claims fail. See Fletcher, 2000 WL
33231616 at *8 (As long as the decision-makers believed that
Plaintiff was not qualified, "even if the decision-makers were
mistaken in their belief, pretext is not established.").[5]

---

[5] Easterling's reliance on the Eighth Circuit's opinion in Lyoch v.
Anheuser-Busch Co., Inc., 139 F.3d 612 (8th Cir. 1998) (Easterling
Br. at 41), is misplaced.  The Court in Lyoch does not even discuss
pretext.  Further, the law in the Eleventh Circuit is well-
established that "[t]he heart of pretext inquiry is not whether the
employee (or independent contractor) agrees with the reasons that
the employer gives for the discharge, but whether the employer
really was motivated by those reasons."  See Standard, 161 F.3d at
1333.

In yet another futile attempt to establish pretext, Easterling asserts that a wrestler's qualifications were of no importance to WCW, because "[a] wrestler's success was limited only by the creative imaginations and intentions of WCW's white bookers, regardless of 'talent' or even wrestling experience." (Easterling Br. at 21).  This conclusory assertion that WCW could wave a magic wand and make any wrestler successful lacks any evidentiary support and defies logic.  Easterling testified that wrestlers were essentially actors, and that, among other things, charisma and crowd appeal were necessary attributes to succeed as a professional wrestler.  (Easterling Dep. at 92-93).  Indeed, some wrestlers became popular and successful despite initially receiving little exposure or promotion, while others never achieved the same level of success or popularity regardless of efforts to promote them. (Juster Dep. at 89-93).  For example, former WCW wrestler Lex Luger never achieved success in the World Wrestling Federation despite receiving significant exposure and promotion; whereas, WCW wrestler Bill Goldberg enjoyed great success despite initially receiving only minimal exposure and promotion.  (Id.)

Easterling selectively points to the fact that actor David Arquette briefly became WCW's world heavyweight champion, even though Mr. Arquette had no prior "wrestling experience." (Easterling Br. at 21).  This fact **supports** WCW's use of non-

-14-

discriminatory criteria. As WCW has repeatedly expressed, it promoted those wrestlers or performers who it thought had the most potential to appeal to large audiences and draw fan interest, regardless of the individual's race or, in some circumstances, prior wrestling experience, such as an already famous actor, like David Arquette. (Juster Dep. at 93). Moreover, Easterling ignores the fact that WCW heavily promoted and featured Karl Malone, Reggie White, Dennis Rodman, and Percy Miller (a rapper known as "Master P"), all of whom were famous African-American athletes or entertainers who had no prior wrestling experience, and WCW paid them substantial sums of money. (Bischoff Dep. at 145-49). The fact that African-American performers with no prior wrestling experience were given such opportunities undermines Easterling's pretext assertion, and underscores that WCW extended opportunities to any wrestler or performer who was likely to help generate substantial interest for the company by attracting fans and viewers and entertaining its audiences. Because Easterling cannot establish that WCW's proffered nondiscriminatory reasons for its actions taken with respect to Easterling are pretextual, his claim of discriminatory treatment fails.

   C.   **Easterling Cannot Establish A Pattern Or Practice Claim.**

   Easterling further erroneously argues that he can somehow establish a pattern and practice of discrimination and that the

Court should therefore presume that WCW discriminated against each plaintiff, including him. (Easterling Br. at 29-30). Easterling's argument is baseless. Easterling cannot point to any practice undertaken by WCW or any pattern existing at WCW that even appears to have or show a discriminatory effect on him or other African-American wrestlers.

Easterling repeatedly argues that all of the decision-makers at WCW were white and used informal methods to promote wrestlers. Contrary to Easterling's contention, this is not evidence of any improper pattern or practice, much less evidence of discrimination. The Eleventh Circuit has unequivocally held that "'[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the [law] does not interfere.'" Fletcher, 2000 WL 33231616, at *8. Given this standard, WCW's consistent use of race-neutral criteria in making decisions, no matter how informal its process, simply does not establish a pattern and practice of discrimination. Moreover, the mere fact that many of WCW's decision-makers were white does not establish a discriminatory pattern or practice. Criminal Bd. Of Educ. Of Cairo School Dist. No. 1, 147 F.3d 533, 543 n.19 (7th Cir. 1998).

Easterling also attempts to rely on "statistics" which he contends show "conclusively that WCW's practices were

discriminatory." (Easterling Br. at 27-28). These conclusory assertions are insufficient to establish any pattern or practice of discrimination at WCW and represent yet another unavailing attempt by Easterling to circumvent the requirement that he proffer evidence -- not mere surmise or conjecture -- to support his individual case. Easterling has not presented any competent evidence with respect to the number of African-American or white applicants who actually sought positions and/or opportunities at WCW, nor as to the percentage of such applicants who were even minimally qualified and committed to being WCW wrestlers. See Howard v. BP Oil Co., Inc., 32 F.3d 520 (11th Cir. 1994) (explaining that statistical evidence is irrelevant in a § 1981 race discrimination case where the plaintiff fails to present evidence as to the number of minorities who actually applied and were rejected and evidence of the success rate of equally-qualified white applicants). Instead, Easterling has relied upon uneducated guesses about applicants generally to draw his "statistical" conclusions.

As the Eleventh Circuit has instructed, vague allegations of a numbers disparity, "without an analytic foundation, are virtually meaningless." Brown v. American Honda Motor Co., 939 F.2d 946, 952 (11th Cir. 1991). "To say that very few blacks have been selected by [WCW] does not say a great deal about [WCW's] practices unless

we know how many blacks have applied and failed and compare that to the success rate of equally qualified white applicants." Id. at 952. Easterling's reliance on unsubstantiated "statistics" does not create an issue of fact on his pattern and practice claim. Id.; Mays v. Union Camp Corp., 114 F. Supp. 2d 1233, 1241 n.2 (M.D. Ala. 2000).

Easterling's proffered statistical theories, which lack any evidentiary foundation, also are contrary to well-settled law in the discrimination context. In this area, "[e]stablishing the percentage of members of a particular group in the . . . workforce (or a segment thereof), without more, proves nothing; the essence of statistical proof requires a comparison." B. Lindemann & P. Grossman, EMPLOYMENT DISCRIMINATION LAW 1689 (3d ed. 1996); see also Hawkins v. Ceco Corp., 883 F.2d 977, 985 (11th Cir. 1989) (evidence that plaintiff was only African-American salaried employee for a ten-year period is irrelevant without comparative evidence), cert. denied, 495 U.S. 935 (1990).[6] Given that Easterling's proffered statistics prove nothing, his claim that his alleged "expert's" statistical findings somehow "demonstrate

---

[6] Even if Easterling had offered probative statistical evidence, the Supreme Court has cautioned that general determinations as to the composition of a defendant's labor force are of limited usefulness "as to an individual's hiring [or promotion] decision, particularly in the presence of an otherwise justifiable reason" for the decision. McDonnell Douglas, 411 U.S. at 805 n. 19.

compelling evidence of illegal discrimination at WCW" (Easterling
Br. at 27-28) is baseless.[7]

### D.   **Easterling Cannot Establish A Hostile Work Environment Claim**

In a disjointed and confusing effort to establish his hostile
work environment claim, Easterling inexplicably cites to a number
of cases addressing the standard for **pattern and practice claims,**
without any discussion or rational legal argument to support
Easterling's apparent attempt to connect the two unrelated claims.
In fact, Easterling provides no legal or evidentiary basis for his
hostile work environment claim in his brief.  Rather, Easterling
attempts to support his hostile work environment claim by relying
on alleged statements and conduct that he never witnessed or
experienced.

Easterling misleadingly asserts that he has "identified dozens
of slurs, epithets, and jokes" to support his claim. (Easterling
Br. at 31).  However, there is no evidence that Easterling was
**personally subjected** to any hostile treatment at WCW.   In fact,
Easterling testified that he cannot recall being subjected to **any**
racial slurs while at WCW.  (Easterling Dep. 79-80).  Further,

---

[7] Furthermore, because the statistical evidence and conclusions
proffered by Easterling lack any basic competence or evidentiary
value, as established by Defendants' expert report (attached hereto
as Ex. A), Defendants intend to file a Daubert motion to entirely
exclude Easterling's expert report in its entirety.

Easterling concedes that because of his imposing size he was not subjected to racial "attitudes" at WCW. (Easterling Br. 5-6).

The only alleged incidents of racial hostility at WCW that Easterling testified he was aware of are a few alleged occasions where he contends that a WCW employee either informed him of a racial comment purportedly made by someone else or offered their own subjective opinion regarding discriminatory practices. (Easterling Dep. at 68, 72-78, 80-81). Easterling's testimony regarding these alleged incidents are inadmissible hearsay. Such hearsay, surmise, and conjecture cannot save Easterling's hostile environment claim. see Edwards v. Wallace Community College, 49 F.3d 1517, 1520-21 (11th Cir. 1995) (concluding that hostile environment claim was without merit because many of the alleged statements were either speculation or hearsay, and because there was insufficient information as to when the alleged statements were made).

Because Easterling has failed to establish that he personally was subjected to an environment in which racial slurs were commonplace and overt, his hostile work environment claim fails. See Dixon v. Young 2000 WL 33224515, *5 (N.D. Ga. 2000) ("[a]n

employee can hardly contend that his environment was racially hostile if he did not experience the alleged hostility.").[8]

Easterling's contention that his work environment was hostile because black wrestlers were "segregated" from white wrestlers during training (Easterling Br. at 6) is belied by the undisputed evidence of record.  Power Plant trainees were separated into training groups based upon their skill level.  The uncontroverted evidence establishes that each training group consisted of both black and white wrestlers.  (Easterling Dep. at 55).  In fact, Elix Skipper, another African-American trainee, trained in the advanced group about which Easterling complains and went on to become a popular and successful wrestler with WCW.  (Bruce Dep. at 101-103, Bischoff Dep. 154, 172).  Because the training groups were racially diverse and integrated, Easterling's claim that separate training groups created a racially hostile environment fails.

Easterling's hostile environment claim also fails because Easterling has not established that the alleged discriminatory conduct **unreasonably interfered with his work performance**.  See

---

[8] Notably, Easterling claims that when he was at WCW he was consistently provided with positive feedback and compliments on his size.  (Easterling Br. at 5-6, 38-39).  Such support could not possibly create "an objectively abusive and hostile atmosphere." Edwards, 49 F.3d at 1521 (11th Cir. 1995) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).  Easterling's assertion also contradicts his vague and summary claim in his brief that he was somehow discriminated against with respect to the provision of training.  (Easterling Br. at 20).

Mitchell v. Carrier Corp., 954 F. Supp. 1568, 1578 (M.D. Ga. 1995).
Despite Easterling's assertions of discriminatory conduct, he does
not assert that the alleged discriminatory conduct had an impact on
his performance as a wrestler and, to the contrary, contends that
his performance at WCW was so exemplary as to warrant a trainee
contract.  (Easterling Dep. at 62).  Accordingly, because
Easterling cannot present any evidence to support his hostile work
environment claim, this claim must be dismissed.

**II.   THE FAIR LABOR STANDARDS ACT DOES NOT APPLY TO EASTERLING.**

The FLSA provides minimum wage and overtime pay requirements
only to employees as defined therein.  29 U.S.C. §§ 203(e)(1) and
(g), 206(a), and 207(a).  Easterling asserts that he qualifies as
an employee for purposes of the FLSA and relies upon Harrell v.
Diamond Entertainment, Inc., 992 F. Supp. 1343 (M.D. Fla. 1997).
Contrary to Easterling's argument, Harrell establishes that the
**FLSA does not apply** to Easterling.

Easterling invokes Harrell to assert that WCW retained the
degree of control over its wrestlers necessary to create an
employer/employee relationship.  Harrell is factually distinct from
this case.  In determining that the exotic dancers were employees,
the Harrell Court found that exotic dancing required no special
skill, given that "[t]here were no dance seminars, no instructions
booklets, and no choreography whatsoever." Id. at 1351.  By

contrast, WCW wrestlers underwent extensive wrestling training and
instruction and choreographed their own wrestling matches.  Harrell
neither requires nor supports a finding that Easterling was an
employee of WCW for purposes of the FLSA.

Moreover, in Harrell, the court explained that the minimum
wage and overtime provisions of the FLSA do not apply to 'any
employees employed in a bona fide executive, administrative, or
professional capacity....'"  To qualify as a professional in an
artistic field of endeavor for purposes of the FLSA:  (1) the field
must be recognized; (2) the professional's work must be original
and creative in character; and (3) the professional must be engaged
in work, "the result of which depends primarily on the invention,
imagination, or talent of the employee."  Harrell, 992 F. Supp. at
1357.  "[T]his requirement is easily met by a person employed as an
actor."  Id. (emphasis added).

It is undisputed that wrestling events are scripted
entertainment shows in which professional actors with specialized
skills use their imaginations to achieve a predetermined wrestling
result.  Easterling himself acknowledged that wrestlers are actors
who participate in scripted matches.  (Easterling Dep. at 92-93).
Thus, even if Easterling could be considered an employee under the
FLSA, professional wrestlers/actors, such as Easterling, are

nonetheless exempted from the FLSA's coverage.  Harrell, 992 F.
Supp. 1355-57.

Furthermore, Easterling does not dispute the fact that while
he was training at WCW he held two non-wrestling jobs on a full-
time and part-time basis, and that he determined when he trained at
the Power Plant and when he went to his other jobs.  (Easterling
Dep. at 23-24, 36).  Easterling also developed his own wrestling
persona, decided which costumes to wear, and was responsible for
finding and purchasing his costumes.  (Id. at 35-39).  Further,
when WCW compensated Easterling for performing services, he was
paid by the job and WCW did not withhold his taxes.  (Id. at 47-
48).[9]  These factors establish that Easterling was not an employee
of WCW for purposes of the FLSA.  See Donovan v. Techco, Inc., 542
F.2d 141, 143-44 (5th Cir. 1981).[10]

---

[9] At his deposition, Easterling stated that he was paid for
services he performed for WCW.  (Easterling Dep. at 47-48).  In
response to Defendants' Motion, Easterling now contends that he was
never paid.  (Easterling Br. at 45).  Easterling's after-the-fact
contradiction is at best disingenuous and cannot create an issue
for summary judgment.  See Van T. Junkins & Assocs. v. U.S. Indus.,
736 F.2d 656, 656 (11th Cir. 1984) (holding that a party cannot
create an issue for summary judgment with an affidavit that
contradicts prior testimony without giving any valid explanation).
[10] Easterling's claim that he "worked at least 50-55 hour per week",
(Easterling Br. at 45), contradicts his own affidavit, in which he
states that he spent less than thirty hours a week at the Power
Plant, and that he spent the majority of those hours training.
(Easterling Aff. at ¶ 4, Easterling App. at Tab A).

## III. **EASTERLING HAS NOT ESTABLISHED AN EMOTIONAL DISTRESS CLAIM.**

Easterling does not dispute that there is nothing other than WCW's alleged discrimination that purportedly caused him emotional harm. (Easterling Dep. at 88). Because Easterling is required under Georgia law to establish more than just alleged discriminatory conduct to sustain an intentional infliction of emotional distress claim, summary judgment must be entered on this claim. Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992); Ward v. Papa's Pizza To Go, Inc., 907 F. Supp. 1535, 1542 (S.D. Ga. 1995).

### CONCLUSION

For all of the foregoing reasons, and the reasons set forth in Defendants' Initial Brief, Defendants' Motion for Summary Judgment should be granted on all of Easterling's claims asserted in this action, and all of Easterling's claims should be dismissed.

This 17th day of March, 2003.

TROUTMAN SANDERS LLP


_____
JOHN J. DALTON
Georgia Bar No. 203700
ERIC A. RICHARDSON
Georgia Bar No. 233873
JAMES A. LAMBERTH
Georgia Bar No. 431851
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Reply Memorandum has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).

This 17th day of March, 2003.

Eric A. Richardson
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000



# EXHIBIT / ATTACHMENT

## _____A_____

(To be scanned in place of tab)

**Assessment of Dr. David W. Rasmussen's Expert Report for Plaintiffs in Walker, *et al. v.* World Championship Wrestling, Inc., *et al.***

David W. Peterson, PhD
Peopleclick, Inc.
Two Hannover Square, 9th Floor
Raleigh, NC  27601
(919) 645-2800

November 19, 2002

Lisa Grant Harpe, PhD, and Murray S. Simpson, PhD
contributed to the formulation and writing of this report.

## Assessment of Dr. David W. Rasmussen's Expert Report for Plaintiffs in Walker *et al. v.* World Championship Wrestling, Inc., *et al.*

1. Peopleclick, Inc. is retained by counsel for the defendants to assist with statistical aspects of the cases filed by plaintiffs against World Championship Wrestling, Inc., Turner Sports, Inc., Turner Entertainment Group, Inc. and Turner Broadcasting System, Inc. We respond here to a report submitted by plaintiffs' expert, Dr. David W. Rasmussen.[1] In his report, Dr. Rasmussen claims to provide evidence that World Championship Wrestling, Inc. (WCW) treated African Americans differently than it treated other applicants and contractors with respect to hiring and pay. Having reviewed his report, we conclude that Dr. Rasmussen establishes neither that WCW hired wrestlers in a discriminatory fashion, nor that WCW paid its wrestlers in a manner that discriminated against African Americans. These conclusions rest on Dr. Rasmussen's failure to produce statistical comparisons that focus on the treatment of African Americans relative to other similarly situated applicants and contractors, and to his erroneous application of several statistical models.[2]

### Dr. Rasmussen's Hiring Analysis

2. Disparate treatment of African Americans occurs when an employer intentionally treats African Americans differently from similarly situated non-African Americans. For example, disparate treatment occurs when an employer requires only African Americans to take a hiring test or when an employer applies different hiring standards for a given position depending on the race of the applicant. In investigating hiring discrimination in these lawsuits, the question of interest is whether WCW treated African-American applicants for wrestler positions differently from other similarly situated applicants. To address this question, one should compare the racial composition of the pool of qualified applicants for wrestler positions to the racial composition of the people hired as wrestlers from that pool. In this way, the hiring choices made by WCW can be contrasted with the range of alternatives reasonably available to it to determine whether its decisions were systematically unfavorable to African Americans.

---

[1] Dr. Rasmussen's report is in Plaintiffs' Rule 26 (a)(2) Disclosures of Expert Testimony of Dr. David W. Rasmussen, filed in the United States District Court for the Northern District of Georgia (Atlanta Division).
[2] Throughout our report, we generally do not contest the correctness of the data on which Dr. Rasmussen relied in conducting his analyses, or the correctness of his summaries of those data, for we have at present no way of verifying either. To the extent that Dr. Rasmussen's underlying data are incorrect or incomplete, inferences drawn from them may be unreliable.

3. Dr. Rasmussen fails to do a direct comparison of new hires to applicants in two important respects. First, instead of using applicants, he uses various estimates of the racial composition of the labor market from which he presumes WCW might reasonably be expected to draw its wrestlers. Second, instead of using new hires in the comparison, he uses all persons retained as wrestlers by WCW as of any time during the period 1996 – 2000. The result is a comparison that does not illuminate the issue of whether WCW treated African-American applicants any differently than it treated other similarly qualified applicants. Furthermore, taking account of the uncertainty in Dr. Rasmussen's labor market estimates, one finds that the racial composition of the wrestlers retained by WCW during 1996 – 2000 is consistent with Dr. Rasmussen's labor market estimates, and consequently this corrected analysis provides no cause to believe that race had anything to do with WCW's hiring decisions. These points are amplified in turn below.

*Dr. Rasmussen Does Not Study Applicants*

4. Unable to identify the pool of individuals who applied for wrestler positions during his period of analysis (1996 – 2000), Dr. Rasmussen bases his statistical analysis on several estimates of the racial composition of applicants for wrestler positions under the tacit assumption that the group of individuals attending WCW's Power Plant wrestling school either constitutes the entire qualified labor force from which WCW did or should draw its wrestlers, or else that the group provides an adequate indication of the racial composition of that labor force. For this purpose, Dr. Rasmussen relies on (i) subjective estimates by certain people of the percentage of African Americans who attended WCW's Power Plant training school, and (ii) a list of persons identified by WCW as having trained at the Power Plant school during the period 1996 – 2000. Dr. Rasmussen augments his statistical analysis with some additional observations based on (iii) the percentage of African Americans in occupations he considers similar to wrestling. As shown below, none of these sources provide a reliable estimate of the racial composition of WCW's qualified labor pool.

5. *Subjective Estimates of Power Plant Trainees.* In Table 1 of his report, Dr. Rasmussen lists the percentages of African Americans at WCW's Power Plant training school subjectively estimated by five individuals. These estimates are diverse, ranging from a low of 10% to a high of 40%. Dr. Rasmussen identifies by name the five people who provided these subjective estimates, but he indicates nothing about their qualifications to make such estimates,

-2-

about the question to which they were responding, about the basis for their estimates, about whether they might be motivated either to over- or under-estimate the representation of African Americans, or about the period of time to which the estimates pertain — all issues that affect the reliability of these estimates.

6. *List of Power Plant Trainees.* Dr. Rasmussen also bases an estimate of the racial composition of Power Plant trainees on a list he identifies as Exhibit B to Interrogatory 3 of the Supplemental Response to Plaintiffs' Consolidated First Interrogatories. This he claims is a list "by which the WCW has identified each individual who was a trainee at the Power Plant over the 1996 – 2000 period." He asserts that 13.4% (or 11 out of 82) of the people on this list are African American. Leaving aside issues related to the completeness and accuracy of the list, we note that (i) the 13.4% is, unlike the subjective estimates discussed above, objective – its basis is explicit and one can address its reliability by examining the reliability of the data on which it is based, and (ii) to the extent that the list is not synonymous with the pool of applicants from which WCW might reasonably be expected to hire its wrestlers, the 13.4% estimate is prone to error of various types.

7. Consider first the objectivity of the 13.4%. The list to which Dr. Rasmussen refers apparently names 82 people, and by some process yet unknown to us, a race has been associated with each name on that list. Apparently, each name on the list was at some point considered individually, and a determination made as to the race of that person. Such a process, if done carefully, with accurate information, and applied to a comprehensive list, will yield a much more reliable estimate of the racial composition of the wrestler trainees at the Power Plant than will the offhand or subjective guesses of the sort on which Dr. Rasmussen first relies. Thus, the 13.4% is facially much more compelling an estimate of the racial composition of Power Plant trainees than are any of the subjective estimates.

8. Consider next the approximate nature of the 13.4% estimate. It may fail to be a reliable indication of the labor market from which WCW might reasonably be expected to draw its wrestlers for a variety of reasons. First, WCW may draw its wrestlers not only from the Power Plant, but from other sources as well. Second, the list on which Dr. Rasmussen relies may be incorrect or incomplete. Third, the list may contain some people who are not qualified to wrestle for WCW.

-3-

9. In any event, it is likely that the 82 people on the list are at best just a portion or sample of the people constituting the labor market from which WCW might reasonably be expected to draw. As such it is subject to sampling error, the kind of error that occurs when calculations are based on just a portion of the total population of interest. In the present case, the total population of interest is the collection of people interested in and qualified to provide services as wrestlers with WCW. Even if this sample were chosen from the target population perfectly in accord with statistical sampling protocols, sampling error will almost surely cause the proportion of African Americans in the sample to differ somewhat from that in the target population.

10. When the sample is drawn in accord with acceptable statistical practice, the magnitude of the sampling error can be characterized in the form of a confidence interval. A confidence interval reflects the margin of error associated with an estimate. For example, a survey of voters may indicate that 48% of voters favor a particular bond offering, with a 3% margin of error. This means that while 48% of the people surveyed favor the bond, the actual percentage of the total population which favors the bond is uncertain, but quite likely (usually 95% likely) to be in the range of 48% − 3% = 45% up to 48% + 3% = 51%. This range, from 45% up to 51%, is called the 95% confidence interval for the percentage of voters favoring the bond. In the present cases, the 95% confidence interval for the representation of African Americans within the target population extends from 6.9% to 22.7%.[3] That is, while 13.4% of the people in the sample of 82 wrestlers are African American, that sample could reasonably have been drawn from a population that is anywhere from 6.9% to 22.7% African American. Hence, if the representation of African Americans among newly hired wrestlers were anywhere in the range of 6.9% to 22.7%, no statistical inference of hiring discrimination would be raised.[4]

---

[3] This confidence interval is based on exact left- and right-tail binomial probabilities. There is a simpler calculation often used in practice that yields an approximate 95% confidence interval. In this case that approximate interval runs from 6.0% to 20.8%.

[4] To anticipate a point made later in this report, we note that according to Dr. Rasmussen, 7.5% of the people who wrestled for WCW during 1996 – 2000 were African American. Since 7.5% falls within the range of 6.9% to 22.7%, there is no statistical indication that, relative to their representation in the Power Plant, African Americans were underrepresented among WCW's wrestlers.

11. *Similar Occupations.* Dr. Rasmussen augments his labor market estimates by considering occupations he considers similar to wrestling. He notes that professional football and basketball require athleticism, speed and the ability to follow a scripted sequence of events. He further notes that the percentage of African Americans in professional football (67%) and basketball (80%) is much larger than the subjective estimates (10% – 40%) of their representation in the WCW training school, his objective estimate (13.4%) of their representation, or the percentage (7.5%) of African Americans among the wrestlers under contract with WCW at some time during 1996 – 2000. Although athletic ability is required of professional football players, professional basketball players and professional wrestlers, the type and amount of public speaking, acting and performing and the type of scripted events that must be followed by the participants differ substantially. Whereas in professional football and basketball, teams focus their athletic abilities on winning within the rules of the game, the focus of professional wrestling is not to win but rather for individual wrestlers to entertain. The script in basketball and football is a plan for scoring; whether or not the plan works is a function of luck and the ability of the players. In wrestling, the winner is foreordained; that is part of the choreography. The job of the wrestlers is to act out that script in the most authentic and entertaining fashion, rather like a ballet. While this requires athleticism, it also requires individual stage presence, the ability to create an artificial and consistent persona, and the ability to act. These are qualities generally not required of a good football or basketball player. There is no particular reason why the racial composition of people interested in and qualified for professional football or basketball teams should match that of people interested in and qualified for retention as wrestlers with WCW.

### Dr. Rasmussen Does Not Study New Hires

12. The data available to Dr. Rasmussen apparently do not permit him to determine the number or racial composition of people awarded contracts as wrestlers by WCW during the period 1996 – 2000. In lieu of this information, Dr. Rasmussen uses the entire group of 232 people who, at any time during 1996 – 2000, had a wrestling contract with WCW and were paid. In effect, Dr. Rasmussen presumes that the number and racial composition of WCW's wrestler workforce over this period are synonymous with those of the new hires over this period.[5] Thus,

---

[5] As the source of his workforce information, Dr. Rasmussen relies on a list of people he identifies as Exhibit A to Interrogatory 3 of the Supplemental Response to Plaintiffs' Consolidated First Interrogatories. It is our

Dr. Rasmussen's hiring analysis reduces to a comparison of WCW's wrestler workforce over the 1996 – 2000 period to the trainees at its Power Plant wrestling school. This is two significant steps removed from a comparison of wrestlers newly hired by WCW to the pools of applicants from which those new hires were selected, and as a consequence Dr. Rasmussen's analysis fails to shed light on whether, among similarly qualified applicants, African Americans were hired in the same proportions as others.

13. One point is abundantly clear – the 232 wrestlers in the WCW workforce were not all hired from the pool of 82 trainees at the Power Plant because 232 is larger than 82. Hence the labor market from which the 232 wrestlers were recruited consists of more than just the Power Plant trainees during 1996 – 2000, or else the list of 82 is incomplete, or perhaps both. Dr. Rasmussen's use of the entire workforce in lieu of new hires overlooks several difficulties, described next.

14. *Failure to Distinguish New Contracts, Renewal Contracts and Existing Contracts.* Dr. Rasmussen characterizes Exhibit A, a spreadsheet containing names of wrestlers and various dollar amounts of pay, as listing the wrestlers under contract with WCW between 1996 and 2000.[6] Some of these wrestlers may be "new hires" in the sense of signing their first contract with WCW sometime between 1996 and 2000. Others may have signed multi-year contracts prior to 1996, and their appearance in Exhibit A reflects either on-going service under an existing contract or a contract renewal, but not a "new hire." Almost surely, WCW's decision-making process for (i) selecting new wrestlers differs from the process for (ii) renewing prior contracts and the process for (iii) honoring contracts currently in effect. Dr. Rasmussen makes no allowance for these differences. Instead, he mistakenly treats the entire workforce – those who were newly hired during 1996 – 2000, those whose contracts were renewed during that time and those whose pre-1996 contracts spilled over into the period – all as though they were newly hired during that time. The use of WCW workforce statistics in this manner overstates the number of new hire decisions actually made by WCW during the 1996 – 2000 period, and is an unreliable guide to the racial composition of the people hired as wrestlers during this time.

---

understanding that this list does not contain information about the races of the people named, and that the information about race on which Dr. Rasmussen relies comes from one or more of the plaintiffs in these cases.
[6] Plaintiffs' Rule 26(a) (2) Disclosures of Expert Testimony of Dr. David W. Rasmussen, page 4.

15. *Failure to Account for Prior Experience and Success.* Exhibit A lists a number of people who were "publicly famous in entertainment industries other than wrestling before they became involved with WCW."[7] Among these are David Arquette, Karl Malone, Dennis Rodman and Reggie White. Dr. Rasmussen labels these four individuals "disputed," and excludes them from several of his analyses. His decision to exclude them is tacit recognition that their prior experience and success is relevant and should be a consideration in deciding which African American and non-African American wrestlers should be compared to one another in a hiring study. Other wrestlers listed in Exhibit A may have prior experience and success with wrestling organizations other than WCW or with WCW itself. Dr. Rasmussen does not account for these differences in prior experience and success in any of his studies, thus failing to compare wrestlers similarly situated with respect to their prior experience and success.

*Dr. Rasmussen Uses Inappropriate Statistical Models*

16. In Table 2 of his report, Dr. Rasmussen compares the racial composition of 228 WCW wrestlers to each of a variety of benchmarks, expressing each disparity as a number of standard deviations based on a binomial probability model. As an analysis of new hires, this comparison is misleading for reasons already given above, including the uncertainty of the labor market estimates and the uncertainty of the composition of the people about whom hiring decisions were made during the 1996 – 2000 period. There is an additional error inherent in Table 2 that serves to inflate the numbers of standard deviations, namely the presumption in the statistical calculations that there were 228 (or, in Part B of Table 2, 232) hiring decisions. While there may have been 228 (or 232) wrestlers on the payroll during those years, the number of hiring decisions made by WCW during that time was almost surely well less than that, due to contracts already in place as of the beginning of that period. Were there, say, only a quarter of that number of actual new hire decisions made during that time period, the numbers of standard deviations shown in Table 2 would be cut approximately in half. In particular, the composition of the new hires would be found, by Dr. Rasmussen's analysis, to be well less than two standard deviations away from his 13.4% benchmark, and hence to provide no indication that African-Americans were hired by WCW in disproportionately small numbers.

---

[7] Declaration of Bobby Walker, dated November 7, 2002.

17. In his Table 3 analysis, Dr. Rasmussen compounds this error. He presents a variation in which each of the 228 wrestlers included in his Table 2 is purportedly replicated by the number of years in which each received compensation during the period from 1996 through 2000. Thus, a person among the 228 who received compensation only in one year is counted once, a person who received payment in two years is counted twice, and so forth. In this fashion, the 228 individuals are multiplied up into a group of 681 "salary years." In Dr. Rasmussen's Table 3, the racial composition of this group of salary years is then compared to the benchmarks used in Table 2, again using a binomial probability model.

18. The binomial probability model is inapt for this purpose. One of the assumptions underlying this model is that each of the 681 salary years can reasonably be regarded as having been selected independently of all the others from a very large pool of salary years. But for an individual who has more than one salary year, it is quite obvious that the selection of the second and subsequent salary years derives from some pool other than the one from which that individual's first salary year was originally chosen; such decisions are ones of renewal rather than *de novo* selection. Indeed, for a wrestler who has a multi-year contract, there is no selection or renewal decision at all until the contract has run its course.

19. Dr. Rasmussen's method of analysis in Table 3 is a material misapplication of the binomial probability model, and should be accorded no evidentiary weight whatsoever.

*The Composition of WCW Wrestlers is Consistent with Dr. Rasmussen's 13.4% Estimate*

20. Dr. Rasmussen's hiring analysis comes down to a comparison of the representation of African Americans among the 228 (or, in his Table 2B, 232) WCW wrestlers to his estimate of the representation of African Americans in the labor pool from which he believes WCW should be expected to hire its wrestlers. As we discussed above, Dr. Rasmussen's most plausible estimate of the latter is that based on the list of 82 Power Plant trainees, namely 13.4%. As we also noted, there is a margin of error associated with that estimate because it is clearly not based on the entire labor market from which WCW hires. The margin of error from this source (and there are other possible sources of error, which could serve to widen this interval) runs from 6.9% to 22.7%. That is, based on the presumption that 11 out of 82 (13.4%) of the Power Point trainees are African American, it follows that the population from which these people

might be considered a representative sample is composed of African Americans to an extent somewhere in the range of 6.9% to 22.7%.

21. Dr. Rasmussen indicates that 17 of the 228 (7.5%) WCW wrestlers are African American (excluding the "famous ones," namely David Arquette, Karl Malone, Dennis Rodman and Reggie White). But since 7.5% lies within the range of 6.9% to 22.7%, there is no statistical indication here that African Americans have been hired in disproportionately small numbers. If one includes the "famous ones," the percentage rises from 7.5% to 8.6%, again well within the 6.9% to 22.7% confidence interval, again providing no support for the contention that African Americans received less than their fair share of wrestling jobs with WCW.

**Dr. Rasmussen's Pay Analysis**

22. Dr. Rasmussen contends that his report provides evidence of disparate treatment in pay by WCW to the disadvantage of African Americans. To address the merits of a disparate treatment claim concerning pay, one must identify a group of people similarly situated at some point in time in the past and compare the progression of their pay rates over time. Racial disparities in pay progression that cannot be explained by non-discriminatory factors, such as performance or generated revenue, would suggest disparate treatment in regard to pay decisions. Dr. Rasmussen does two analyses of pay. The first fails to produce a racial disparity that is statistically significant, and therefore provides no indication that African Americans were systematically paid less than other WCW wrestlers. His second analysis produces a statistically significant imbalance to the disadvantage of African Americans, but only because he misapplies a statistical test. When correct statistical models are applied to his data, they again produce no statistical indication that African Americans were systematically paid less than other WCW wrestlers. None of Dr. Rasmussen's pay studies identify wrestlers who were similarly situated with respect to their qualifications or past experience, nor do they account for non-discriminatory factors that may appropriately affect wrestlers' pay, such as talent, charisma, wrestling or athletic ability, or ability to generate revenue. These points are amplified below.

*Lack of Statistical Significance and Use of an Inappropriate Statistical Model*

23. Dr. Rasmussen asserts that there were ten wrestlers who, during the period from 1996 through 2000, earned $750,000 or more in a year, a group he calls "the salary elite." In all,

there were 29 instances ("salary years") in which these ten individuals earned $750,000 or more in a year during these five years. Dr. Rasmussen avers that since African Americans account for 7.5% of all salary years during this period, that "we expect that they should receive about that portion" of the 29 salary years in excess of $750,000, which works out to 2.18 salary years. He claims that in fact there were none,[8] and expresses the difference between 2.18 and 0 as a number of standard deviations, obtaining 1.18.

24. First, this result is not statistically significant. That is, the disparity between the expected number of 2.18 salary years and the actual number (according to Dr. Rasmussen) is within the range of variation one would reasonably expect of an employer that does not discriminate. Only if the disparity is greater than about two standard deviations is the inference raised that some factor other than chance may be contributing to the disparity. In this case, the disparity is only 1.18 standard deviations.

25. Second, Dr. Rasmussen has again misapplied the binomial probability model. That model rests on the assumption that the 29 salary years can reasonably be regarded as having been selected independently and at random from a large pool of salary years, 7.5% of which are associated with African Americans. But that is not a reasonable presumption for the same reasons discussed above in connection with Dr. Rasmussen's Table 3. A wrestler who is on a multi-year contract does not undergo "selection" in the years in which his contract assures him of retention. Thus, a wrestler who signs a contract assuring him of a salary in excess of $750,000 in 1997 and in 1998 makes only one deal with WCW that assures him two of Dr. Rasmussen's "elite" salary years, yet Dr. Rasmussen, through his use of the binomial model, counts that single transaction as two separate and independent negotiations. The binomial model is also inapt here because a wrestler who attains a salary level of $750,000 in one year is almost surely more likely to do it again the next year than is the typical wrestler who has never before attained that level. Yet the binomial model presumes that the attainment of a second or third elite salary year is no more probable than the attainment of the first. For these reasons, application of the binomial model in these circumstances produces unreliable results.

---

[8] For purposes of this analysis, Dr. Rasmussen leaves out the four "disputed" wrestlers, two of whom (Karl Malone and Dennis Rodman, both African American) were each paid more than $750,000 in one year.

*Faulty Statistical Reasoning and Another Use of an Inappropriate Statistical Model*

26. Dr. Rasmussen's analysis of the relative amount of time it takes for a wrestler's pay to reach $600,000 is likewise based on a misapplication of statistical reasoning. In Table 5, Dr. Rasmussen indicates that there are two African American wrestlers (B. Huffman and L. Huffman) whose salaries reached $600,000, and that they achieved these salaries after the Huffmans each wrestled for WCW for three years during the period from 1996 through 2000. Dr. Rasmussen's Table 5 indicates that there were two non-African American wrestlers (Goldberg and S. Rechsteiner) who likewise attained a $600,000 pay level after wrestling for WCW for three years during 1996 through 2000. Finally, his table indicates that there are ten other non-African American wrestlers whose pay topped $600,000 in some year during 1996 – 2000, but these wrestlers all previously wrestled for WCW during this period for less than three years.

27. Dr. Rasmussen analyzes these data using a sign test, and once again he has chosen the wrong statistical model for the situation. A sign test is a statistical procedure involving an analogy between a series of observed events that can be summarized as a sequence of plus and minus signs, and the results of tossing a fair coin a number of times in succession. Dr. Rasmussen notes that the three years associated with the two African American wrestlers is more than the number of years associated with ten of the non-African American wrestlers in Table 5, and that these differences can be interpreted as a sequence of minus signs. He concludes that the resulting sequence is "statistically significant with less than one chance in 100 that this could occur by chance alone." To obtain his sequence, he compares the Huffmans' three-year periods with the shorter period associated with each of ten other people in Table 5, noting that each such comparison produces a negative difference in numbers of years. Implicitly likening each of these ten comparisons to the toss of a coin, he then equates these results to a situation in which a coin tossed ten times in succession lands heads up every time. The probability of such an event, assuming the coin is fair, is less than one in 100, just as Dr. Rasmussen indicates, and so he concludes that it takes African American wrestlers statistically significantly longer to reach the $600,000 annual pay level than it does other wrestlers.[9]

---

[9] A probability of less than one in 100 is mathematically equivalent to an imbalance of more than 2.33 standard deviations. Hence, if this were a correct application of the sign test, it would have produced a result showing an imbalance in excess of two standard deviations. As noted in the text, it is not a correct application.

28. Several fallacies underlie this conclusion. First, Dr. Rasmussen does not account for the fact that there are also two non-African-American wrestlers (Goldberg and S. Rechsteiner) with whom, like the Huffmans, a three-year period is associated in his Table 5. He simply ignores these two wrestlers, though their numbers of years are identical to those of the Huffmans. This is clearly illogical and it biases the test in favor of a finding of statistical significance.

29. Consider an extreme case. Suppose that Table 5 contained 300 (instead of just two) white wrestlers each with an associated period of three years. That would surely indicate that three years is the norm, that the two Huffmans fit squarely within the norm, and that there must be something unusual about the ten white wrestlers with whom fewer than three years are associated. One certainly could not logically discard those 300 white wrestlers from the analysis, but that is exactly what Dr. Rasmussen's procedure would do, and he would reach the same conclusion that he does in his report.

30. A second fallacy underlying Dr. Rasmussen's analysis is that he compares the two Huffmans as a single entity against each one of the non-African American wrestlers individually (except for Goldberg and S. Rechsteiner, who, like the Huffmans, have three years associated with them). There is no logical basis for this asymmetric method of comparison. Either the comparisons should involve all possible combinations of individuals, or else they should be between groups of individuals. There is no logical basis for the comparison on which Dr. Rasmussen bases his test of statistical significance.

31. A third fallacy behind Dr. Rasmussen's salary analysis is that it makes little allowance for the qualifications or experience the wrestlers may have had prior to 1996, or with employers since 1996. Dr. Rasmussen tacitly acknowledges that this consideration is important, because he does exclude from his analysis four people whose pay in at least one year exceeded $600,000, but whose careers are unusual. Two of these people, Karl Malone and Dennis Rodman, both African American basketball stars, signed on with WCW. Malone earned more than $600,000 in his first year (1998) and Rodman earned more than $600,000 in his second year (1999). But for their exclusion on the basis of their prior fame, they would have been accorded 0 years and 1 year, respectively, in Dr. Rasmussen's Table 5. Two other people, Terry Bollea ("Hulk Hogan") and Randy Poffo earned over $600,000 in 1996, and though they

appear in Dr. Rasmussen's Table 5, they are not counted in his sign test, possibly in recognition of their pre-1996 accomplishments. But some of the other wrestlers named in Table 5 may also have prior experience serving to distinguish them from others on the list. For example, 11 people[10] listed on Table 5 each received pay from WCW in 1996, suggesting that their careers with WCW may have predated 1996, and therefore that some or all of their numbers of years to attain the pay rate of $600,000 shown in Table 5 may be understated.[11] As a result, Dr. Rasmussen's comparisons of the numbers of years wrestlers took to be paid at least $600,000 in a year shown in that table are not a reliable indication of differences in treatment based on race.

32. A proper analysis of the data in Dr. Rasmussen's Table 5 reveals that there is no statistically significant difference in the pattern of years associated with African Americans from that associated with the other wrestlers on the list. One such analysis notes that two out of twelve, or 16.7%, of the non-African American wrestlers are associated with three years, and asks how likely it is that the only two African-American wrestlers, consistent with such odds, would both be assigned three years. The answer to that question is one chance in 36, which equates to an imbalance of 1.91 standard deviations. This being less than two standard deviations, it raises no suggestion that race played a role in its creation.

33. Another such analysis, based on ranking the wrestlers in accord with their numbers of associated years, produces a racial imbalance of 1.51 standard deviations.[12] Again this difference, being less than two standard deviations, is of such small magnitude that it is within the range conventionally attributed to chance, and does not raise the inference that African American wrestlers on the list have, as a group, been treated any differently than the non-African Americans.

[10] Steven Borden, Page Falkinburg, Richard Fliehr, Bill Goldberg, Scott Hall, Booker Huffman, Lash Huffman, Kevin Nash, Lawrence Pfohl, Scott Rechsteiner and Roderick Toombs.
[11] Page Falkinburg's number of years is in fact understated. Falkenburg is shown in Table 5 as having waited one year to get to $600,000, but in fact he was paid in 1996 and 1998 (though not 1997), and then he surpassed the $600,000 level in 1999. This would seem to qualify him for at least a "2" in Table 5's Time-to-$600,000 column.
[12] This type of analysis is called a rank sum test. It is a well-known and widely accepted form of analysis, and it is applicable to the present circumstances.

-13-

34. As with his misapplications of the binomial probability model noted previously, Dr. Rasmussen has failed with his sign test to match a fact situation properly to its statistical abstraction. Such technical failures cause his probability and statistical significance calculations to be unreliable, and improperly grounded in the methods and procedures of science. These technical failures are quite distinct from issues related to the completeness and correctness of his data and the relevance to this litigation of the issues he investigates.

**Conclusion**

35. Dr. Rasmussen's analyses are far removed from the types that permit a convincing indication of disparate treatment in hiring and pay. Instead of comparing new hires to applicants, he compares the entire group of WCW wrestlers to trainees at the Power Plant wrestling school. Instead of comparing the rates of pay or pay advancement for wrestlers similarly situated at some point in time, he analyzes the "salary years" and a dubious measure of time-to-salary of a so-called "salary elite." Thus, his comparisons have little or no connection to the issues of interest in these cases.

36. Correcting Dr. Rasmussen's several statistical modeling errors, and taking account of the uncertainty in his labor force estimates, one finds that his studies, properly interpreted, provide no statistical indication that African Americans were treated any differently by WCW than were other similarly situated applicants and contract wrestlers.

David W. Peterson
November 19, 2002

**Sources**

Declaration of Bobby Walker, dated 11/07/2002

Second Amended Complaint in the matter of Bobby Walker v. World Championship Wrestling,
   Inc, and Turner Sports, Inc., dated April 27, 2001

Plaintiffs' Rule 26(a)(2) Disclosures of Expert Testimony of J. Steve Hicks, dated 06/26/2002

Plaintiffs' Rule 26(a)(2) Disclosures of Expert Testimony of Statistician, dated 08/02/2002

Plaintiffs' Second Amended Supplemental Response to Initial Disclosures Providing Expert
   Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2), dated 11/06/2002

Excel spreadsheet labeled Wrestler Earnings.xls

**Retention Terms**

David W. Peterson is retained through Peopleclick, Inc. which bills his time on this project at the
hourly rate of $390.

**Publications and Qualifications**

Dr. Peterson's resume, listing his publications and professional affiliations is attached.

**Previous Testimony**

A list of cases in which Dr. Peterson has testified at trial or by deposition since January 1, 1996 is
attached.

David W. Peterson

DAVID WEST PETERSON

1942 Rock Rest Road                                  Home:  919-542-6937
Pittsboro, North Carolina  27312                     Office:  same

Personal:  Born 1940, U.S.
           Married, two children


Higher Education:

        B.S., University of Wisconsin at Madison, 1962     )
        M.S., Stanford University, 1963     )
        Ph.D., Stanford University, 1965     )Electrical Engineering


Employment History:

| | |
|---|---|
| 1960 | Engineering Trainee, General Electric Company |
| 1961-62 | Research Assistant, Computer Laboratory, Department of Electrical Engineering, University of Wisconsin |
| 1962-63 | Member, Technical Staff, Hughes Aircraft Company |
| 1963-65 | Research Assistant, Systems Laboratory, Stanford University |
| 1965-67 | Mathematician and Hybrid Simulation Project Officer,  U.S. Army Electronics Command, Fort Monmouth, NJ |
| 1967-70 | Assistant Professor of Quantitative Methods, Northwestern University Graduate School of Management |
| 1970-73 | Associate Professor of Managerial Economics and Decision Sciences, Northwestern University Graduate School of Management |
| 1971-72 | Research Fellow, International Institute of Management, Berlin |
| 1973 | Visiting Lecturer, Systems Engineering, University of Illinois at Chicago Circle (spring quarter) |
| 1973-84 | Professor, Graduate School of Business Administration, Duke University, Durham, NC |
| 1979-2000 | President, PRI Associates, Durham, NC |
| 1982-86 | Senior Lecturer, Duke Law School |
| 1984-89 | Adjunct Professor, Graduate School of Business Administration, Duke University, Durham, NC |
| 1989-94 | Adjunct Professor, Institute for Statistics and Decision Sciences, Duke University, Durham, NC |
| 2000-02 | Senior Vice President, Peopleclick, Inc., Raleigh, NC |

David W. Peterson

Various consulting activities undertaken for the U.S. Public Health Service, U.S. Army Electronics Command, and numerous private corporations, law firms and governmental agencies.

Languages:

> English (native)
> German (working knowledge)
> Some French, Russian and Chinese

Professional Memberships:

> Institute for Electrical and Electronic Engineers
> Econometric Society
> The Institute of Management Sciences
> The American Statistical Association

Professional Publications:

Numerous technical articles published in internationally circulated journals, treating topics in the theory and application of mathematical modeling in areas such as radio propagation, control of economic systems, optimization of static and dynamic systems, statistical decision making, the measurement of employment opportunity equality, and the detection of computer code theft.

Professional Speaking Engagements:

Technical papers read at meetings of the IEEE Man, Systems and Cybernetics Group, the Econometric Society, The Institute for Management Sciences and the American Statistical Association. Many semi-technical engagements in the U.S., Europe and the Middle East, generally pertaining to mathematical modeling applications in management. Speaker at numerous seminars for lawyers dealing with statistical applications in litigation.

Long Term Professional Interest:

To be involved in the analysis of situations of a managerial, economic or engineering nature, requiring a carefully chosen blend of mathematics and computation. This involvement may be in the form of performing the analysis, teaching others to perform it, or supervising others as they perform it. A combination of the three would be ideal.

David W. Peterson

Amplifying Remarks:

While at Stanford University I was involved in a project whose chief aim was to analyze radar return data to discriminate among different types of vehicles entering the atmosphere. Problems of primary concern in this project were data processing speed and discrimination accuracy.

While at Fort Monmouth I was involved in two major types of activities. The first was the construction and analysis of models describing very-low-frequency electromagnetic propagation in the earth-atmosphere-ionosphere system and in the lithosphere. The first-named involved the construction of a model and the estimation of its parameters using data gathered as part of the project. The second-named was primarily a theoretical study. Both resulted in professional publications.

The second major project with which I was associated was the simulation of various helicopter fire control systems on a large scale hybrid computer. In this project I was responsible for the construction of a model of a fire control computer, for the stochastic subroutines associated with the simulation, and for various subroutines involving the generation of certain artificial images for the benefit of the pilot. The system simulated was comprehensive in that it included the pilot and a gunner (both of them live) and a cockpit with a visual display consisting of a television-scanned terrain belt on which were superimposed artificially-generated data relating target size and location to the trajectories of tracer rounds. The challenge in this task was to simulate the aircraft flight dynamics, the tracer round trajectories and the feel of the aircraft on the pilot and co-pilot controls, to within acceptable tolerances, subject to limitations on computer memory and computational speed.

At Northwestern I taught courses in mathematical programming, elementary probability and statistics, computer programming and applications, and optimal control to graduate students in management, attracting some students from economics, computer science and industrial engineering.

My research interests have been in establishing a logical-mathematical foundation for information theory, and the construction and analysis of dynamic econometric models. A year spent at the International Institute of Management in Berlin enabled me to bring to publishable form the results of several investigations in these areas, as well as to make personal and professional acquaintances in several European and Middle Eastern communities.

While at Duke my activities in the early years were directed toward improving the quality and volume of research of junior faculty, to developing an expanded Ph.D. program, to revising the MBA curriculum, and to exploring and developing bases on which GSBA faculty and students can interact with faculty and administrators in various departments outside the GSBA. I developed a special interest in the application of statistical methods to the measurement of the equality with which an employer extends employment opportunities to employees of differing ages, sex or ethnicity. These activities led to several publications, speaking engagements and consulting assignments, and to the formation of PRI Associates.

A - 3

David W. Peterson

Other work experience includes:

a. the formulation of a plan for a national health data information center, and for its process of creation

b. the design of a computer-based inventory management system for a $50M per year mail-order firm

c. the provision of statistical advice to researchers studying the effects on costs and services of a merger of nine hospitals in Arizona

d. the provision of criticism, advice and encouragement to researchers establishing a methodology for evaluating the effects of different types of care extended to elderly Americans

e. consultation with legal teams on the structuring of statistical data presented at judicial proceedings involving employment discrimination

f. formation of PRI Associates, Inc., providing statistical consultation services on matters pertaining to the use of statistical methods in litigation, and on matters related to software development

David W. Peterson

Bibliography:

1.  Ilt--Inverse LaPlace Transform, IBM 1620 Digital Computer Program, IBM Program
    Information Department Library File Number 6.0.164, September, 1964.

2.  Discriminant Functions--Properties, Classes, and Computational Techniques, Ph.D. thesis,
    Rept. SU-SEL-021, Technical Report 6761-2, Stanford Electronics Laboratories, Stanford,
    California, April 1965.

3.  A Theorem on Decision Boundaries, *Proceedings of the 12th Annual Conference of Army
    Mathematicians*, Dartmouth College, Hanover, New Hampshire, June 22-23, 1966 with K.
    A. Belser.

4.  A Method of Finding Linear Discriminant Functions for a Class of Performance Criteria,
    *IEEE Transactions on Information Theory*, IT-12, No. 3, July, 1966, pp. 380-387, with R. L.
    Mattson.

5.  A Theorem on Single Sample Confidence Intervals, 13th Annual Conference of Army
    Mathematicians, Fort Monmouth, New Jersey, June 7-8, 1967. Also, *Proceedings of the
    IEEE*, Vol. 55, No. 9, September 1967, pp. 1637-1638, (Correspondence).

6.  The Mathematics of Information--A Critique, paper read at the U.S. Army Electronics
    Command Advanced Planning Briefing and Technical Symposium, Fort Monmouth, New
    Jersey, March 7, 1968.

7.  A Model for Electromagnetic Propagation in the Lithosphere, *Proceedings of the IEEE*, Vol.
    56, No. 5, May 1968, pp. 799-804, with F. H. Schwering and S. B. Levin.

8.  A Proposed Method for Predicting the Phase Behavior of a VLF Radio Signal, *Journal of
    Atmospheric and Terrestrial Physics*, Vol. 31, 1969, pp. 225-232.

9.  Using the Maximum Principle and a Hybrid Computer for Production Planning, with Robert
    R. Gann, *Proceedings of the American Institute for Decision Sciences Meeting*, New
    Orleans, Louisiana, October 1969.

10. Some Convergence Properties of a Nearest Neighbor Decision Rule, Record of the IEEE
    Systems Science and Cybernetics Conference, October, 1968, San Francisco, also *IEEE
    Transactions on Information Theory*, Vol. IT-16, No. 1, January 1970, pp. 26-31.

11. A Stabilizing Transformation for Numerical Solution of Maximum Principle Problems, with
    R. Gann, *IEEE Transactions on Automatic Control* (correspondence), Vol. 15, No. 6,
    December 1970, pp. 686-687.

David W. Peterson

12. A Sufficient Maximum Principle, *IEEE Transactions on Automatic Control* (correspondence), February 1971, Vol. 16, No. 1, pp. 85-86.

13. Optimal Control and Monetary Policy, with E. M. Lerner, *International Economic Review*, Vol. 12, No. 2, June 1971.

14. The Response of Prices and Income to Monetary Policy: An Analysis Based Upon a Differential Phillips Curve, with E. M. Lerner and E. J. Lusk, *Journal of Political Economy*, Vol. 19, No. 4, July/August 1971, pp. 857-866.

15. Equitability in Multi-Agent Dynamic Systems: The Case of Two Agents and Four States, presented at the European Econometric Society Meeting, Barcelona, September 1971, published in revised form in the *Nigerian Journal of Quantitative Economics*, Vol. 1, No. 1, March 1975, pp. 33-58.

16. Equitability in Multi-Agent Dynamic Systems: The Case of m Agents and nm States, *Proceedings of the Joint Conference on Major Systems*, Sponsored by IEEE Systems, Man and Cybernetics Group and by ORSA, Anaheim, California, October 1971.

17. Comments on "Economics of Information Systems," by Jacob Marschak, in *Frontiers of Quantitative Economics*, M. Intriligator, ed., North-Holland Publishing Company, Amsterdam, 1971, pp. 107-108.

18. The Economic Significance of Auxiliary Functions in Optimal Control, presented at the Econometric Society North American Meeting, August 1971, *International Economic Review*, Vol. 14, No. 1, February 1973, pp. 1-19.

19. A Review of Constraint Qualifications in Finite Dimensional Spaces, *SIAM Review*, Vol. 15, No. 3, July 1973, pp. 639-654.

20. Some Relationships Between Hierarchical Systems Theory and Certain Optimization Problems, with Y. M. I. Dirickx and L. P. Jennergren, presented at the IEEE Systems, Man and Cybernetics Group Conference, Washington, D. C., October 1972; *IEEE Transactions on Systems, Man and Cybernetics*, Fall 1973.

21. On Sensitivity in Optimal Control Problems, *Journal of Optimization Theory and Applications*, Vol. 13, No. 1, January 1974, pp. 56-73.

22. Toward a Mathematical Definition of Information, *Proceedings of the Sixth Annual Southeastern Symposium on System Theory*, February 1974.

23. On Dynamic Behavior of the Regulated Firm, with James Vander Weide, presented at the Econometric Society Winter Meetings, 1974, revised March 1975.

A - 6

David W. Peterson

24. Transferring Ideas from Engineering to the Social Sciences, *Proceedings of the IEEE*, Vol. 63, No. 3, pp. 354-359, March 1975.

25. Trader-Commodity Parity Theorems, with D. Graham, P. Jennergren, and R. Weintraub, *Journal of Economic Theory*, Vol. 12, No. 3, June 1976.

26. A Note on the Optimal Investment Policy of the Regulated Firm, with J. H. Vander Weide, *Atlantic Economic Journal*, Vol. IV, No. 3, Fall 1976, pp. 51-55.

27. A Strategy which Maximizes the Geometric Mean Return on Portfolio Investments, with S. F. Maier and J. H. Vander Weide, *Management Science*, Vol. 23, No. 10, June 1977, pp. 1117-1123.

28. A Monte Carlo Investigation of Characteristics of Optimal Geometric Mean Portfolios, with Steven F. Maier and James H. Vander Weide, invited paper, presented at a joint session of the Econometric Society and the American Finance Association Winter Meeting, 1974, revised and published in the *Journal of Financial and Quantitative Analysis*, June 1977, pp. 215-233.

29. Quadraticity and Neutrality in Discrete Time Stochastic Linear Quadratic Control, with Carole Aldrich, *Automatica*, Vol. 13, 1977, pp. 307-312.

30. The Coordination of Short-Run Decision Making with Long-Range Planning, with D. Loughridge and W. Damon, *Omega*, Vol. 4, No. 6, 1977, pp. 1-12.

31. On the Estimation of the Racial and Sexual Composition of the Labor Force Available to an Employer, in *Perspectives on Availability*, Equal Employment Advisory Council, August 1978.

32. A Review of Direct Sufficiency Conditions in Optimal Control Theory, with J. Zalkind, *International Journal of Control*, Vol. 28, No. 4, 1978, pp. 589-610.

33. An Analytic Framework for Evaluating Rolling Schedules, with K. Baker, *Management Science*, Vol. 25, No. 4, April 1979, pp. 341-351.

34. *Use of Statistics in Equal Employment Opportunity Litigation*, with Walter B. Connolly, Jr., New York Law Journal Seminars Press, February 1980 (1982, 1983, 1985, 1987, 1988, 1989, 1991, 1992, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001).

35. Pitfalls in the Use of Regression Analysis for the Measurement of Equal Employment Opportunity, *Journal on Policy Analysis and Information Systems*, Vol. 5, No. 1, March 1981, pp. 43-65.

36. An Empirical Bayes Estimate of Market Risk, with S. F. Maier and J. H. Vander Weide, *Management Science*, Vol. 28, No. 7, July 1982, pp. 728-737.

David W. Peterson

37. Measurement Error, Regression and Equal Employment Opportunity, in *Statistical Evidence of Discrimination*, D. H. Kaye and M. Aickin, eds., Marcel Dekker, New York, 1986.

38. Measuring Pass-Fail Employment Test Impact Disparities, presented at the joint National Meeting of ORSA/TIMS, October 1982.

39. A Regression Specification Test Based on Observation Exchanges, presented at the American Statistical Association meetings, August 1984, Philadelphia, PA. Revised June 1985.

40. *Law and Contemporary Problems*, Vol. 46, Autumn 1983, No. 4, Special Editor for the Symposium on Statistical Inference in Litigation.

41. Data Acquisition and Analysis, in *Statistical Evidence in Litigation*, David W. Barnes and John Conley, Little, Brown, Boston 1986.

42. Trial by Regression: Detecting and Measuring Disparate Treatment in Employment Discrimination Litigation, presented at the American Statistical Association meetings, August 1986, Chicago, IL.

43. The Role of Experts in Software Infringement Cases, with John M. Conley, *Georgia Law Review*, Vol. 22, No. 2, Winter 1988, pp. 425-468. Reprinted in *Computer Law & Practice*, Vol. 5, No. 3, pp. 99-110 (Part 1) and Vol. 5, No. 4, pp. 147-153 (Part 2).

44. Court-Imposed Methodological Constraints: An Employment Discrimination Example, with John M. Conley, presented at the American Statistical Association meetings, August 6-9, 1990.

45. The Employment Discrimination Case of Bayes v. Fisher, presented at the Second International Conference on Forensic Statistics, Arizona State University, Tempe, AZ, May 19-21, 1993.

46. When Ethical Systems Collide: The Social Scientist and the Adversary Process, with John M. Conley, in Kniffka, Hannes, *Recent Developments in Forensic Linguistics*, Peter Lang, Frankfurt am Main, 1996, pp. 345-358.

47. Review of Daniel L. Rubinfeld's Reference Guide on Multiple Regression in the Federal Judicial Center's 1994 Reference Manual on Scientific Evidence, *Jurimetrics*, Vol. 36, No. 2, Winter 1996, pp. 213-216.

48. Science of Gatekeeping: The Federal Judicial Center's New Reference Manual on Scientific Evidence, with John M. Conley, *North Carolina Law Review*, Vol. 74, No. 4, April 1996, pp. 1183-1223.

David W. Peterson

49. Pay Discrimination Models, *Journal of Forensic Economics*, Vol. 12, No. 2, Spring/ Summer 1999, pp. 111-124.

50. Of Cherries, Fudge and Onions:  Science and its Courtroom Perversions, with John M. Conley, *Law and Contemporary Problems*, Vol. 64, No. 4, Autumn 2001, pp. 213-240.

51. In Quest of the Perfect P-Value, *Journal of Forensic Economics*, forthcoming.

David W. Peterson

Newsletter Articles:

1.  Measurement of Age Discrimination, *Personnel Research Report*, Vol. 1, No. 1, July 1981.

2.  Measurement Error, Regression, and Equal Employment Opportunity, *Personnel Research Report*, Vol. 1, No. 2, October 1981.

3.  Notes on Statistical Proof: Rebuttal and Cumulative Impact, *Personnel Research Report*, Vol. 1, No. 3, January 1982.

4.  Age Profiles and Workforce Reductions: Some Basic Relationships, *Personnel Research Report*, Vol. 2, No. 1, July 1982.

5.  Statistical Models and Employer Discretion, *Personnel Research Report*, Vol. 2, No. 2, October 1982.

6.  Binomial v. Hypergeometric Employee Selection Models, *Personnel Research Report*, Vol. 2, No. 4, April 1983.

7.  Preponderance of Evidence, P-values and Standard Deviations, *Personnel Research Report*, Vol. 3, No. 1, October 1983.

8.  Age Patterns in Employee Flow, *Personnel Research Report*, Vol. 3, No. 2, April 1984.

9.  Testing the Plausibility of A Regression, *Personnel Research Report*, Vol. 3, No. 3, July 1984.

10. Workforce Reductions: A Time for Preventive Statistics, *PRI Report*, Vol. 4, No. 3, October 1985.

11. Data Acquisition for Litigation (Part 1 & II), *PRI Report*, Vol. 5, No. 1, April 1986, Vol. 5, No. 3, March 1987.

12. Underutilization: The Small Group and Large Group Problems, and a Proposed Solution to Both, *PRI Report*, Vol. 5, No. 2, July 1986.

13. Calculating Mitigated Lost Earnings, *PRI Report*, Vol. 5, No. 4, June 1987.

14. Using Computers to Prepare Evidence, *PRI Report*, Vol. 6, No. 1, October 1987.

15. Samples, Populations and the Whole Universe, *PRI Report*, Vol. 6, No. 2, July 1988.

16. Lost Future Income: Calculating Expected Present Values, *PRI Report*, Vol. 6, No. 3, October 1988.

David W. Peterson

17. Detecting Discrimination in Peremptory Challenges, *PRI Report*, Vol. 6, No. 4, December 1990.

18. One Tail or Two?  Or Does it Really Matter?, *PRI Report*, Vol. 7, No. 1, June 1991.

19. The Worst of Ten is Pretty Bad, *PRI Report*, Vol. 8, No. 1, July 1997.

20. Standard Deviation Calculations: A Refinement for Small Numbers, *PRI Report*, Vol. 8, No. 3, May 1998.

21. What Does a Regression Analysis Really Show?, *PRI Report*, Vol. 8, No. 4, November 1998.

22. Compensation Analysis à la OFCCP, *PRI Report*, Vol. 9, No. 2, March 2000.

23. Compensation Analysis:  Accounting for Employer Latitude in Setting Pay, *The Report*, Vol. 1 No. 1, February 2001.

24. A Regression Example for Those Who Still Believe in it, *The Report*, Vol. 1 No. 3, August 2001.

25. Normal Equivalent Standard deviations, *The Report*, Vol. 1 No. 4, March 2002.

## Cases in which David W. Peterson has Testified at Trial or by Deposition
### Cases Involving Testimony Since January 1, 1996

| Case Name | Depo or Trial | Date | Venue |
|---|---|---|---|
| Albers v. Provident Mutual Life Insurance Co., et al. | Deposition | 3/13/02 | Telephone |
| Allen, et al. v. Entergy & AP&L | Deposition | 1/30/97 | Little Rock, AR |
| American Cyanamid v. Impact Profiles v. Phoenix Marketing Group | Deposition Trial | 7/25/95 4/30-5/1/98 | New Jersey |
| Bayless v. Hallmark Marketing, Inc. | Deposition | 11/1/99 | Durham, NC |
| Bleimehl v. Eastman Kodak Company 4-93-CV-30802 | Deposition Trial | 5/4/96 5/20/96 | Telephone USDC SD IA Des Moines, IA |
| Bryant et al. v. Food Lion 2-90-0505-1 | Deposition Trial | 3/2/93 5/29/97 | Columbia, SC USDC D SC Charleston SC |
| Burns, et al., v. Control Data Corporation | Deposition | 5/23/96 | Washington DC |
| CMAC v. Robert F. deCastro, Inc. et al. 97-0514 | Deposition Trial | 8/17/98, 9/1/98 11/10/98, 11/12/98 | Metairie, LA USDC ED LA New Orleans |
| Colunga v. Hercules et al. 89-C-954B | Trial | 3/21/97 | USDC D UT Salt Lake City |
| Cromartie et al. v. Hunt et al. CV-104-H2 | Deposition Trial | 9/20/99 12/1/99 | Raleigh, NC USDC Raleigh |
| Daniel v. Entergy, et al. | Deposition | 9/5/00 | |
| Dyer et al. v. Publix Super Markets, Inc. | Deposition | 4/15, 19, 20/98; 5/5/98 | |
| Evers et al. v. University of Cincinnati, C-1-95-259 | Deposition Trial | 5/15/96 6/7/96 | Cincinnati, OH. USDC SD OH Judge Weber |
| Hamblin, et al. v. Alliant Techsystems | Deposition | 9/16-17/98 | |
| Holly Mathers et al. v. Northshore Mining Co. | Deposition | 6/24/02 | Raleigh, NC |

B - 1

| | | | |
|---|---|---|---|
| Hoops, *et al. v.* Elk Run Coal Company | Deposition | 2/1, 3, 7/00 | Charleston, WV |
| Kovacevich *v.* Kent State University | Deposition | 5/31/01 | Raleigh, NC |
| Leal *v.* Baptist Health System | Deposition | 9/15/98 | San Antonio |
| McManus *v.* Washington Gas Light Co. 90-3169 (RCL) | Trial | 8/14/96 | USDC DC Judge Lambert |
| Miller *v.* Aristech, 94-1921 | Trial | 1/13/98 | USDC WD PA |
| Nolin *et al. v.* Orange Co. | Deposition | 1/6/97 | Durham, NC |
| Replacements, Ltd. *v.* SKC, Inc. | Deposition | 8/10/99 | Greensboro NC |
| Robert McLaughlin *v.* Rhone-Poulenc Ag Company, Inc. *et al.* | Deposition | 6/8/00 | Durham, NC |
| Shapira *v.* Lockheed Martin Energy Systems, Inc. | Deposition | 9/19/97 | Durham, NC |
| United States *ex rel.* Brett Roby *v.* The Boeing Company | Deposition | 2/8/00 | Washington DC |
| Wales *et al. v.* Jack M. Berry, Inc. | Trial | 5/22/98 | Tampa, FL |
| Wilfong, *et al. v.* Rent A Center | Deposition | 10/31/01 | St. Louis, MO |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DARRON EASTERLING,                    )
                                      )
                  Plaintiff,          )
                                      )        CIVIL ACTION FILE
v.                                    )
                                      )        NO. 1:00-CV-1715-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER        )
BROADCASTING SYSTEM, INC.,            )
                                      )
                  Defendants.         )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this

***DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY***

***JUDGMENT*** upon the interested parties by hand delivery to:

            Cary Ichter
            Charles J. Gernazian
            Michelle M. Rothenberg-Williams
            MEADOWS, ICHTER AND BOWERS, P.C.
            Fourteen Piedmont Center, Suite 1100
            3535 Piedmont Road
            Atlanta, GA  30305

This 17th day of March, 2003.

                        _____
                        Eric A. Richardson
                        TROUTMAN SANDERS LLP
                        Suite 5200, Bank of America Plaza
                        600 Peachtree Street, N.E.
                        Atlanta, GA  30308-2216
                        (404) 885-3000